21-1610. And we should tell counsel you may take your mask off when you're arguing. Okay? So we'll hear from the panel's counsel, Mr. Webster. Good morning. This is the court. My name is Marshall Webster. I represent the appealant in this matter, Delroy Thomas, and this is an appeal taken from a trial that concluded on July 18, 2019. In this case, Mr. Thomas was charged with four counts, count four, which was possession of contraband in prison. It was the jury found him not guilty. However, the first three counts he was convicted of those counts. And the second count, too, was vacated by the district. Yes, and count two, attempted murder, was also vacated. So he was sentenced. Mr. Webster, can you speak into the microphone? Yes. Sorry. I apologize. He was sentenced on count one, which is use of an interstate commerce facility in the commission of murder for hire under federal law. And he was also convicted, was also sentenced under count three, which is attempted retaliation against a witness, which is a local violation of local law. First, I want to begin by saying that I, even though I may not argue certain points in my brief, I do not waive those arguments. And I want to focus more on probably two arguments. And the argument I want to focus on first is the sentencing, where he was sentenced and I think violated federal law, where it was clear that the attempted retaliation against a witness and the use of interstate commerce facility in the commission of murder for hire, I believe that violates the code. Sorry. Yes. I would say more federal statute because the federal statute is clear that where there's an attempt and there's a conviction for attempt of offense, and also conviction of another crime, which was the attempt is the object of the other crime, then that the court cannot impose a consecutive sentence. Aren't these two really separate things we're talking about? Murder for hire, is that really the sole objective of attempted retaliation against the witness? We were talking about one section of the U.S. code and one section of the Virgin Islands code. Correct. And yes, that's true. But the way the U.S. code is written, it doesn't differentiate between whether or not it's local or it's federal. And it basically says… Why would you infer or why would you look at the words and say there's no differentiation? If you're looking at the statute, why would you think there's a tension there? What is it in the wording of the statute that creates the tension you're referring to? Well, yes. I think that under the local law, it says under Virgin Islands code, which would agree with the prosecution, that it says under this code, however, the federal statute doesn't say that. It basically says that if the attempt is the object of the other conviction the defendant receives, then he should not receive a consecutive sentence. And for the purposes of trying this case, I think the jury of the Virgin Islands is also within the jurisdiction of this court. And it doesn't matter whether it's federal or local law, but the object of the use of the interstate cameras facility in commission of a crime for murder, the object was the attempted retaliation against the witness. And that was the sole… What is a murder for hire or attempted retaliation against the witness? It's the same thing. And I think that's why the murder for hire was vacated. Attempted murder for hire was vacated. So, Mr. Webster, you're asking us to interpret the federal statute 3584. In your brief, page 31, you don't cite any particular case that helps you or would help us determine what Congress meant when he used the words sole objective. Do you have any case? Do you have any case law that could help us here to understand your position? No, I don't have any case law at this point to understand the position, but I think the language is clear. And I think that's why the district court judge vacated the attempted murder comp. But how I look at it, the attempted murder comp and the attempted retaliation against the witness is basically the same. And I think for the use of a cameras facility in the commission of a crime for murder and for murder for hire, I think you would run into the same problem if you vacated the attempted retaliation against the witness and left the attempted murder. Because the attempt, which the statute spoke about, is basically the sole objective of the use of the interstate cameras facility. Well, isn't the sole objective of attempted retaliation actually retaliation and not murder for hire? In other words, aren't these two different things altogether? I understand your point about attempt and the sole objective. But in the case of retaliation, the attempted retaliation, the sole objective would be to retaliate. So we've got that and we've got a murder for hire under the federal law. Is it really the same? I think they are, because the retaliation is the murder for hire, right? And so I don't see how they're different. Because it seems like the retaliation is the murder for hire. So whether it's murder for hire or the attempted murder or the attempted retaliation, you're going to have different words, different statutes. But it's objectively the same thing. The objective is the same. Take the murders, the retaliation, and so forth. So that I wanted to talk about. Also… Before you move to your second point, did you want to reserve some time for a follow-up? Five minutes, yes. Okay. That's great. You can see your time is less than half. Sorry. I guess I'm reserving my time. Mr. Webster, let me throw this out to you here on this question. Murder for hire. Wouldn't one of the objectives in the act of murder for hire is getting someone else and paying them, would be two objectives, to murder a third person. Wouldn't those be objectives of murder for hire? I think getting the person would be the overt act that goes beyond the plan, beyond the thought, and that's the act that goes to the attempt. And that's the act that I think we consider for the attempt. And by just doing that act alone, you're already completing at least the attempt by getting someone and saying, this is what I want you to do, even if it doesn't complete with your friends. So that's the attempt. I see my time is almost up. The next thing I want to talk about when I come back is I want to talk about the newspaper article that… I'm laughing because we live in a very smart community and in this community you don't need, you don't even have to read the article. But didn't the record show that the judge and you, I don't know if it was you or the prosecutor, no one saw the article. Yes, Judge, but you don't necessarily have to read the article here to know what's in the article. Because, for instance, someone could call you up and say, friend or family, hey, see you in this case, let's read an article about this case and blah, blah, blah, blah, and tell the person what it was in the article. But without the person having read the article, we have Facebook, we have social media, we have all kinds of means of communication. Now, that gets news to people. Okay, I hear what you're telling us, but is there any evidence even that they were exposed to it, the content from the outside? Well, we know it was a public announcement in the most phenomenal newspaper in the territory, which is the Daily News. There's no other newspaper greater than the Daily News. And it was published in the Daily News when the jury was deliberating. Then they went on a recess, came back to filing it. So whether they receive it, whether they get that information, more likely than not, that information was sold illegally. Let me ask you a question. Number one, we know that the participants in the trial didn't know. The judge didn't know. The lawyers didn't know. So let's put that aside for a moment. You talk about the article coming about nearing the end of the trial, the deliberations were about to start. There was an instruction from the court at the beginning of the case, don't read articles about the case and so forth, right? Yes. Okay. So don't those two facts, the fact that they received an instruction and the fact that the judge and the lawyers hadn't seen the article, there's no ban or restriction on them seeing the article, take those two facts. Plus, the very heavy burden that the Third Circuit Law places on someone in your position advocating on behalf of your client. You've got to come up with something to show the error. We can't really infer the error because lots of people read and lots of people are related and lots of people chat on Facebook, etc. That's what we're asking you for. What more is there that will meet that heavy burden when you have two critical facts that speak against the likelihood that the jurors would know? Even with or without the instruction, if that type of information is communicated to a jury during that critical stage in the proceeding, I would think that the judge would have to make an inquiry. And this information, and it is not like yesteryear. This information was there in the Daily News, the predominant publication in the Virgin Islands. And this trial was publicized. And what came out in it, if it was just an article that was not as damaging as that article. But that article went on to say more than just Mr. Thomas is on trial. It said that he was on trial for the rape of a minor who he impregnated and he used a cell phone from the prison and tried to kill, essentially, the witnesses. And I would say I live in this community for all my life, and I do cases here. I try cases here. I know how information travels in this community. And I would tell you that I think that at least at the bare minimum, when the matter was brought to the court's attention, I can understand myself on the court not knowing who worked it. I'm not paying attention much to anything. But at least at the bare minimum, when it was brought to the court's attention on August 1st, which is less than 15 days, at least that important an inquiry should have been made. Remind me, was it a front-page article? Excuse me? I said, please remind me, was it a front-page article? I think it was. I wasn't going to. No, I don't think it was on the front page. I don't think it was on the front page. I can't say that. I don't think it was on the front page. OK, thank you, counsel. We'll get you out of the public. Good morning, Your Honors. May it please the court. Adam Sleeper. You can take your mask off if you'd like. Yes, Your Honor. May it please the court. Adam Sleeper on behalf of the United States. Jumping right into the sentencing issue that defense counsel has raised, it appears that defense counsel is not pressing the violation of 14 BIC 104 on appeal any longer and is emphasizing 18 U.S.C. 3584A. Fundamentally, the defendant's argument is that 18 U.S.C. 3584A requires a conduct-based inquiry to determine whether various crimes are attempts in the sole objective of the attempts. That approach has not been adopted by any court and has been expressly rejected by at least the Baskin court, that's the Eighth Circuit, and also appears to have been rejected by the Fifield court, that's the Ninth Circuit. Moreover, even if there were a conduct-based approach and the court just assumed that's the way it works, the government would still win in this case because the sole objective, neither of the two crimes the defendant was convicted and sentenced on are sole objectives of the other. Attempted retaliation, the sole objective was completed retaliation, which was killing the witnesses in the underlying superior court case. Similarly, if the commissioning of the murder for hire were viewed as an attempt, then the completed under a conduct-based approach would be the actual murder, which never occurred here. But under a conduct-based approach, we're actually looking at something that looks like two attempts, and the statute doesn't say anything about that. And that, in and of itself, is a further indicator that the statute should be interpreted as an elements-based approach rather than a conduct-based approach. So you're saying count one is essentially an attempt charge? So not under block burger or sort of an elements-based approach, but if we were to be saying what is this crime under a conduct-based approach, it's basically punishing an attempt to murder. But the defendant here has not been convicted of any and sentenced on any completed murder. Shifting over to the newspaper issue. The everyone knows argument. The everyone knows argument. There's just no basis for pulling the jury back to question them about whether they've seen this article. There's no indication that any jurors saw this article. And the judge was pretty good about its instructions, as many trial defendants are, right? Telling them don't read the articles, don't listen to the newspaper, the radio or TV, they're reporting on this, right? Absolutely. There was a full instruction on that before they were sworn and after they were selected. It was mentioned in the opening instructions the following day. It was restated right before the case was given to the jurors. And then repeatedly throughout, there was these reminders about recess instructions. What's the threshold that would have had to have been met in order for an inquiry to be required? There needs to be an affirmative reason to believe that the jurors were exposed. And here there's just no affirmative reason. And I think also that the standard for affirmative reason would shift based on the procedural posture of the case. For example, if this had been brought to the court's attention during trial, I think a less persuasive affirmative reason might have been sufficient. But after trial, what it requires, recalling jurors to be questioned, we're in a different procedural posture. And that's not been acknowledged by this court in the United States v. Gilsanin. And so under these circumstances— Gilsanin is during deliberations or it's after trial? No, Your Honor. Gilsanin is sort of more generally speaking about the distinctions between the two situations. Well, your adversary points out, well, hey, we're a small community. Everybody knows everything, as Judge Greenwood says. Everybody knows. Should we have special sensitivity to that in a less populous area like this one? Your Honor, I wouldn't say that that's a completely irrelevant factor. But I think here where both the defense counsel didn't know about the case, didn't know about the article, the judge didn't know about the article, there's just no reason to believe that this was so widespread in the community that the jurors must have known. And in this case—admittedly, a panel of this court in an unpublished decision in the United States v. Elroy Brow dealt with a very similar situation where there was an article published regarding the case, and instructions were given, and this court said, or the panel said, that there's no basis to say that the jurors should have been polled when there's no indication that any of these jurors actually viewed this article. I suppose the flipside argument is, well, if in a case where there's no sort of affirmative evidence at all of a juror knowing about that reporting, if we were to require a hearing, then in any case that was reported in the press here, they'd have to conduct a hearing, right? Absolutely, Your Honor. Any single article—that's all that's in this record, is that there was one single article during the trial, about the trial, and not only that, it would be that you had—not just that you had to poll the jurors, but that you had to call all the jurors back after a verdict in the case to poll them. That would be the holding in this case, and that's just—there's just no evidentiary basis for taking that step here. How about—was there any evidence of—I know there was an allegation about the removal of a material witness here. Was there evidence of that faith on behalf of the government in that removal? No, Your Honor. There wasn't—first of all, there was no direct evidence of bad faith, and then if you look at it more closely, there isn't even any clearly exculpatory evidence that that witness was offering, so you can't even say in this case that there was apparent exculpatory evidence and then she was removed. The evidence that she was giving was evidence that maybe she was involved in the money drop, but that doesn't undermine any of the elements of the charges in this case. Whether the money was coming from her or from someone else does not undermine count one at all. That's not an element that the defendant himself provides the money. What's the timing with regard to the removal on one hand and the identification of Charles as a potential witness? Like, for instance, if no one knew with regard to the immigration officials that there was this potential conflict, they go through their process. The person is removed on their schedule. Oftentimes, as you know, the court intervenes. Not on this one. The process requires it. Can you just tell us for a moment what the timing was on this, or is timing not an issue? Your Honor, she was convicted of immigration-based violations. I don't have the exact time on that. I can provide that. No, I'm so sorry. I mean with regard to the removal. So she's removed on a particular day. Allen says, hey, that's a problem. We're going to use her as a witness. And my question is, was there an identification of Charles as a witness and then there was a removal? Or was there no clear identification that was brought up at some later time? And coincidentally, the removal happened. Your Honor, so my understanding is that she spoke with law enforcement in I believe it was February of 2016. And she was removed shortly after. So that was in March of 2016. I'm not sure that I would say she was identified as a witness, but obviously she did say things about the case. What I would say is the government, and when I say the government, I would be saying it sort of in the small scope. The prosecutor did not have any idea that she was being removed or anything like that. Okay. But did the government know being prosecution that this person might be a witness to trial? I think the government read whole. I mean, there was an interview with this witness in February of 2016 before she was removed. But the question would be for purposes of the bad faith inquiry. Sorry, who interviewed her? I believe it was Tracy Gardner who interviewed her in February of 2016. And the question then is, is the evidence that or what she said, is that evidence that would have appeared to be exculpatory to Tracy Gardner? And my argument is that there was just nothing in what she said that really appeared to be the type of potentially exculpatory evidence that would have given rise to an inference of that faith. And even if there were an inference of that faith, which the government doesn't believe that there is, for the reasons that I discussed, that it wasn't potentially exculpatory, the government doesn't believe that it would satisfy the materiality provision that would require. Mr. Schlieber, I'd like to go back to the 3584 question a second. You advocate that we should take an elements-based approach as opposed to an approach that would look to the underlying facts of the case. Why is that, and do you have any case law support? Yes, Your Honor. First of all, I think that there's sort of some constitutional avoidance questions in there. They're discussed a little bit in United States v. Fifield. The government doesn't concede that a facts-based approach would necessarily raise constitutional issues, but there's certainly some constitutional avoidance issues there. There's also Baskin, United States v. Baskin, out of the Eighth Circuit, that's 878-5-3-D—I'm sorry, F3-D-1106 takes that approach. United States v. Fifield, 432-F3-D-1956 out of the Ninth Circuit less expressly explains what it's doing, but more clearly indicates that it's taking a conduct—I'm sorry, an elements-based approach. The government is unaware of any appellate court that has taken a conduct-based approach, and I would just also say that this court is reluctant to create circuit splits with no strong reason to do so, and there's just—there is no strong indicator that this statute should be interpreted in a conduct-based way. Is there anything particularly about the language of the statute that you think supports that argument? I guess I would direct you specifically when I look at the words, the sole objective of the attempt. Yes, sir. I mean, I think that if you're doing a conduct-based approach, it's very difficult to identify a sole objective, whereas if you're doing an elements-based approach where you can attempt a crime and the crime itself, it's very clear what the sole objective is. So I certainly see what Your Honor is saying, and I agree. I think that language sort of points in that direction, and it's another factor that this court could look to on that. Okay. I could address the sufficiency of the evidence if the court has any questions on that. I think that primarily comes down to some credibility determinations between Navarro and the defendant and whether or not to credit— Pretty high level of reliance, too, right? Yes, Your Honor. Unless the court has any further questions, I'll take them. Thank you.  Thank you, Your Honor. Thank you, Your Honor. I understand the government's position that the money drop is not an essential element, but that was played out in court and led to a lot of credibility issues. What is the exculpatory evidence that you would offer to us? Yes, would be that you have Ms. Charles, who has been moved. She explained that she never had any conversation with my client. Her boyfriend or fiancé, who was the confidential informant, documented confidential informant, was the one who was asking her for the money and telling her what to do with the money. She had no idea about what he was up to. She also identified a key person, a key player, who never came up in this case except for the testimony of the defendant, who was a corrections officer, who she gave the money to that night, who the confidential informant was talking to on his phone that night. And that's why I said they suppressed evidence, because they e-mailed me evidence on the weekend before the trial, which they have never provided me any evidence in the past through e-mail. I always have the same for whatever evidence I receive from the U.S. Attorney's Office. I've never received e-mail evidence. So I don't look… Everybody here has Facebook, and we're going to assume that they all see Facebook. Well, I don't have a Facebook account, so it's not right to me. You're losing my point. I'm sorry. Earlier you said everybody's on Facebook, everybody knows everybody, they have articles and so forth, so we can impute this knowledge to the jurors that require an investigation. And my point is, if that's so, then when an attorney sends you an e-mail, why should we infer that you received it in a timely manner, you reviewed it, and if there were any actions that you would need to take on behalf of your client, that you had an opportunity to do so? How is it that we should come to some different conclusion than that? Well, I've never received, I've never published any discovery in e-mail before. Second, even if they gave it to me on the eve of the trial, it was still too late for it to be useful for the defense at that particular time, because the defense had already been prepared by Saturday before the Monday of the trial. And so that's… But they received it only… I mean, they were pretty good about turning it around. That's what the record seems to show, that they turned it around as soon as they got it themselves. That's something we're asking for. But I'm saying, sending it to me by e-mail was never the preferred method of providing evidence. Did you want a hand delivery on Saturday? Well, they could have hand-delivered it to me on Monday. I was in court on Monday. And on Monday, the argument would be, oh, my God, you could have e-mailed it to me on Saturday. If you read it to me on Saturday, I'm not going to see it until Monday anyway. I'm not going to see it until Monday anyway, so give it to me on Monday. If you receive it Friday, why not send it on Friday? Why wait until Saturday when I'm not in the office on Saturday? Can we take a step back? I didn't understand your argument with regard to what was exculpatory or potentially exculpatory. Is your argument that the informant was running the show and that your client was just on the side? Is that what we should deem exculpatory? No, no. I think what you deem as exculpatory is the fact that he was not only running the show in prison. He was running the show. He was running his case agent, Ms. Gardner. He was controlling her. He was lying to her and creating this whole scenario, which he didn't know about and which he admits in her testimony. She did not know about Ms. Charles' participation. She did not know of the correction officer, Lake's participation, who was on the phone. And that's what that email was to show, that Mr. Lake was on the phone with the confidential informant the night of the drop. And he was the one taking the money, giving it to Ms. Beazer, who was talking to my client and directing everything. And so you would see that there's a correction officer, the same correction officer my client testified, who opened up his cell for the confidential informant and his cohorts to come in with a knife and threaten his life. And he was a confidential informant and other correction officers testified that that same correction officer worked my client's dormitory and he worked overtime many times. So my client was always subject to the oppression of the confidential informant and his correction officer cohort, who were acting in tandem to do what they did to my client and cause his conviction here. Okay? So thank you very much, Your Honor. Thank you, counsel. We thank counsel for their excellent arguments, both written and verbal today. And we'll take the case under revising. Thank you. Thank you, Your Honor. You're welcome.